UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DAVID GUSTAVISON,

Plaintiff,

Case Number 10-12024-BC
v.                                          Honorable Thomas L. Ludington

ERIC K. SHINESKI and ALEDA
E. LUTZ MEDICAL CENTER,

Defendants.
_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND DISMISSING PLAINTIFF'S COMPLAINT WITH PREJUDICE**

Plaintiff David Gustavison left his position at Covenant Medical Center in Saginaw,

Michigan, and accepted a position as a physician in the emergency Department at Defendant Aleda

E. Lutz Medical Center, also in Saginaw, in August 2008.  Plaintiff, who has multiple sclerosis

("MS") and spinal stenosis, began to experience problems in his new position shortly after he

started.  The position required more walking and standing than he expected, and more than he was

able to tolerate as a result of his MS.  He requested accommodations, including an office closer to

the Emergency Department and stools in the examining rooms, but he contends that his supervisors

ignored his requests.  He also requested to be transferred to different departments that would have

required him to walk less, but he contends that those transfers were denied.

On July 1, 2009, Plaintiff filed a formal complaint with the Equal Employment Opportunity

Commission, alleging that he was discriminated against by his supervisors because of his disability.

*See* Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17,the Rehabilitation Act

of 1973, 29 U.S.C. §§ 701–796*l*.  Plaintiff alleged that the discrimination was demonstrated by his

supervisors' refusal to transfer him to a position in the primary care department in Saginaw or the community-based outpatient clinic in Gaylord; by the hospital's refusal to provide him with an office space closer to the emergency department; and by the lack of stools in the examining rooms in the emergency department.  Plaintiff further alleged that he was harassed as a result of his requests for accommodation.  The complaint was investigated, and the investigator delivered her report to Plaintiff and the agency on September 21, 2009.  [Dkt. # 18-7].  After Plaintiff requested a final agency decision, a finding of no discrimination was issued on February 17, 2010.  On May 19, 2010, Plaintiff filed a four-count complaint in this Court, alleging that he was retaliated against for reporting disability discrimination; that he was harassed because of his disability and for reporting discrimination; that he was discriminated against because of his disability; and that his requests for reasonable accommodations were denied.

Plaintiff's complaint was filed pursuant to the Rehabilitation Act of 1973, which, among other things, prohibits programs or activities that receive federal funding from limiting participation of persons with disabilities, denying benefits to persons with disabilities, or discriminating against persons with disabilities "solely by reason of [their] disability." 29 U.S.C. § 794(a).[1]  The standards for determining whether a person has been discriminated against in her or his employment under the Rehabilitation Act are the same as those used under the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12300.  29 U.S.C. § 794(d).

On March 31, 2011, Defendants filed a motion for summary judgment [Dkt. # 18]. Defendants first contend that all claims against Defendant Aleda E. Lutz VA Medical Center should

---

[1] Although Plaintiff's complaint also identifies Title VII of the Civil Rights Act of 1964, he does not identify how that statute is applicable to this case.

-2-

be dismissed because the only proper defendant in the case is Eric Shinseki, the Secretary of the Department of Veteran Affairs.  Plaintiff concurs that Shinseki is the only proper Defendant. Accordingly, all claims against the Aleda E. Lutz VA Medical Center ("VA Hospital") will be dismissed with prejudice.  The remaining Defendant, Shinseki, further contends that certain claims should be dismissed because they were not administratively exhausted and that the remainder of Plaintiff's claims should be dismissed on their merits.  Plaintiff filed a response on May 5, 2011, and Defendant filed a reply on May 13, 2011.  A hearing initially scheduled for July 7, 2011 was canceled based on the Court's determination that the parties papers provided the necessary information to resolve the motion.  *See* E.D. Mich. L.R. 7.1(f)(2).

Plaintiff's complaint and response to Defendant's motion for summary judgment devote substantial attention to the myriad ways he was allegedly mistreated, discriminated against, and harassed by his supervisors at the VA Hospital.  He does not, however, identify any connection between the alleged mistreatment and his disability or any other protected activity, nor does he allege the type of pervasive harassment necessary to sustain a hostile work environment claim. Accordingly, Defendant's motion for summary judgment will be granted and Plaintiff's complaint will be dismissed with prejudice.

## I.

Plaintiff is a doctor of osteopathic medicine, or D.O., who received his degree from Michigan State University College of Medicine in June 1986.  Pl.'s Dep at 11.  He also received a master's degree in public health from Johns Hopkins University in July 1990.  *Id.* at 14.  He is board certified in occupational and environmental medicine and family practice.  *Id.* at 19

Plaintiff began his career as a private in the U.S. Army in 1979.  *Id.* at 9.  He served in various capacities in the Army and the National Guard through 1995, when he was honorably discharged from active duty.  *Id.* at 15.  He decided to leave the Army because it was becoming increasingly difficult for him to pass required physical fitness tests as a result of symptoms that were later diagnosed to be caused by MS.  *Id.* at 15–16.  He remained in the Army Reserves, however, and he was reactivated on several occasions in the late 1990s and early 2000s.  *Id.* at 17.

After leaving the Army, Plaintiff went to work for St. Luke's Hospital in Saginaw, working in the occupational health department.  *Id.* at 16–17.  St. Luke's became Covenant Medical Center shortly after he joined the hospital.  *Id.* at 17.  Plaintiff remained at Covenant, eventually transferring to the emergency department, until August 2008, when he left to work for the VA.  *Id.* at 18–19.  At the time he left Covenant, Plaintiff was on short term disability leave from Covenant because of his MS and spinal stenosis.  *Id.* at 20, 22.

Plaintiff left Covenant to accept a temporary position in the emergency department at the VA Hospital after several discussions over a period of a few months with Dr. Nicholas Haddad, Acting Chief of Medical Services at the VA Hospital, and Dr. Anthony Albito, a physician in the VA Hospital's emergency department.  *Id.* at 23–24.  Haddad became Plaintiff's supervisor at the VA Hospital.

Before Plaintiff accepted the position, Albito assured him that he would not be required to walk significant distances and that he would have the opportunity to sit down.  *Id.* at 29–30, 39–40.  Plaintiff was offered the position by Haddad, and Plaintiff accepted the offer.  *Id.* at 27.  Both Haddad and Albito knew Plaintiff had MS when Plaintiff accepted the position.  *Id.* at 40.  After Plaintiff accepted the position, he contends that Haddad informed him that the VA Hospital was

-4-

going to "extend the hiring date." *Id.* at 27–28. Plaintiff does not explain the significance of the allegation. Plaintiff began working at the VA Hospital on August 25, 2008, with a regular shift, following orientation, of noon until 8:30 p.m. *Id.* at 28.

Shortly after Plaintiff began working at the VA Hospital, he became uncomfortable with the working conditions and began to request accommodations. Plaintiff believed that his requests were met with hostility, that he had been misled about the amount of walking required at the VA Hospital, and that his concerns about the level of patient care provided by the VA Hospital were ignored. As a result, Plaintiff attempted to return to his former position at Covenant in October 2008. *Id.* at 45, 144–47. Covenant, however, declined Plaintiff's request to work only the noon to 8 p.m. shift, electing instead to put the request to a staff vote. *Id.* at 45–46. As a result, Plaintiff elected to remain at the VA Hospital. *Id.* "I did not want the committee to vote on it, as I felt this was an accommodation, not something that should be voted on as public knowledge," Plaintiff explained. *Id.* at 46.

In January 2009, Plaintiff filed an EEOC complaint against Covenant, alleging that he was constructively discharged when he left Covenant in August 2008 and that Covenant's refusal to rehire him and permit him to work only the noon to 8 p.m. shift was discriminatory. [Dkt. # 18-3]. During his deposition, however, Plaintiff acknowledged that the real reason he filed the EEOC complaint was to gain leverage to recover funds held by Covenant in a retirement savings account. Pl.'s Dep. at 46–47. He was concerned about the stock market's performance during the fall of 2008, and wanted to force Covenant to release the funds. *Id.* Plaintiff and Covenant agreed to a confidential settlement, resolving the EEOC complaint. *Id.*

In this case, Plaintiff contends that the VA Hospital denied him reasonable accommodations in three different ways. *Id.* at 55. First, he contends that he was denied office space in the emergency department where it was quiet enough that he could use dictation software. Second, he contends that he was denied stools in the emergency department's examination rooms so that he could sit while examining patients. Third, he contends that on one occasion in February 2009 Haddad refused to let him leave work when he was ill, and that the refusal endangered Plaintiff and his patients.

The first accommodation Plaintiff requested was an office in the emergency department where he could use dictation software. When Plaintiff accepted the position he believed that he would be provided with space in an office Albito had showed him that was within the emergency department. *Id.* at 56. When space in that office did not materialize, the only place Plaintiff was able to find was a "soiled utility closet" with a "high-chair" and a portable computer. *Id.* at 56–57. In late September or early October, Plaintiff made his first verbal request to Haddad for an office. *Id.* at 58–59. Although Plaintiff did not specifically note that the request was one for reasonable accommodation, "[a]s a physician and as a reasonable person" who knew Plaintiff had MS and was having trouble walking, Plaintiff contends Haddad should have known Plaintiff was requesting an accommodation. *Id.* Haddad said he would "work on it." *Id.* at 59.

Several weeks or a month later, Plaintiff was provided space in a room that previously served as the patient advocate's office. The room was fifty feet from the emergency department. *Id.* at 60. Three or four weeks later, a new patient advocate moved in and Plaintiff was displaced. *Id.* In January 2009, Plaintiff made another verbal request for an office and was placed in Room 120 on the opposite side of the emergency department and about forty or fifty feet from the central area of

the department where patients were seen. *Id.* at 61–62. Room 120 was quieter than the patient advocate's office, but still too far from the main area of the emergency department. *Id.*

Sometime in February 2009, Plaintiff was not feeling well and asked Haddad to call in another physician so that Plaintiff could leave early. Plaintiff contends in his complaint that the request was for a reasonable accommodation, but there is no evidence that Plaintiff indicated at the time he was requesting an accommodation. Dr. Gouda was called in by Haddad and assisted Plaintiff, but Haddad still asked Plaintiff to stay. *Id.* at 63, 87–91. Haddad did not call in the backup Medical Officer of the Day, or MOD, per the usual procedure because that day's backup MOD was Dr. Malloy, who was managing a clinic, and Haddad did not want to interfere with the clinic. [Dkt. # 18-5-I].

On March 6, 2009, Plaintiff made his first written request for an accommodation. Pl.'s Dep. at 63. He elected to make the request in writing because he believed that his earlier requests for office space had been ignored, and Haddad's refusal to let him leave when he was not feeling well in February required a documented response. *Id.* at 63–64. Haddad responded by meeting with Plaintiff on March 16 and forwarding his request for an office to the human resources department. *Id.* at 65–66. Plaintiff contends that Haddad was angry during their meeting. *Id.* at 64. Human resources responded with an e-mail on March 20, 2009, *id.* at 66, and Plaintiff was promptly offered an opportunity to move to an office closer to the emergency department. *Id.* at 66–75. Plaintiff moved into office 117, which he shared with two nurses, and some time later, into office 131, which was apparently the closest office available. *Id.*

Plaintiff's final accommodation request was for stools in the examining rooms. Plaintiff made his first verbal request for stools to Haddad in February 2009. *Id.* at 81. He followed up with

a written request on March 6, 2009, which was discussed along with his request for an office at the March 16 meeting and also passed along to human resources. [Dkt. # 18-5-I]. The request was initially denied because the furniture acquisition form did not indicate that it was part of a request for accommodation. Nevertheless, the bureaucratic problems were soon resolved and Plaintiff was provided with stools in June 2009—three months after he made the formal request. [Dkt. # 18-5-K–L].

While Plaintiff was working on obtaining accommodations for his MS, he was also the subject of three complaints. One patient and two fellow healthcare professionals raised concerns about the level of care Plaintiff provided three patients. After a review by a committee of doctors, two of the cases were assigned a Level III, meaning "[m]ost experienced, competent providers would have managed the case differently (significant deviation from standard of care)." [Dkt. # 18-5-A–C]. Level III was the lowest rating the committee of doctors could choose. As a result of the Level III rating, Plaintiff's charts were subject to a "focused review" by Haddad. [Dkt. # 18-2-11]. A focused review was required by hospital policy any time a peer review screening resulted in a Level III rating. *Id.* The focused review required Haddad to review Plaintiff's charts over a period of several-months. Plaintiff contends the focused review was discriminatory, and part of Haddad's campaign against him. Pl.'s Dep at 137.

On June 5, 2009, Plaintiff met with Shelly Pullen, the director of human resources, and Haddad to discuss his requests for accommodation. At the meeting, Plaintiff asked to be transferred to the primary care department because the pre-scheduled appoints, consistent shifts, and the ability to see patients in one location would better accommodate his disabilities. *Id.* at 152–55. It is undisputed that the only open primary care position had already been offered to another doctor. *Id.*

at 152–53.  Plaintiff further contends that Haddad told him he was not qualified for the position, and

that Pullen told him he could not be transferred to a permanent position from a temporary position.

*Id.* at 153.  The person who was offered the position declined, however, and Plaintiff was offered

a position in the primary care department three days later.  *Id.* at 153–54.  Defendant contends that

the position Plaintiff was offered was the same primary care position he requested.  Defs.' Br. at

7–8.  Plaintiff, however, contends that the position he was offered was a less-desirable "float"

position.  Pl.'s Dep. at 154.  It is undisputed that Plaintiff was also offered a primary care position

in Gaylord, Michigan, which he accepted on June 10, 2009.  *Id.* at 154–55.  Plaintiff was told he

would be transferred to Gaylord as soon as a replacement could be hired in Saginaw.  *Id.*  Plaintiff

responded that he would like the transfer to occur before winter and the parties agreed that a late-

September transfer would be appropriate.  *Id.*

On July 1, 2009 Plaintiff filed a formal EEOC complaint.  [Dkt. # 18-7].  On August 1, 2009,

the VA Hospital instituted a hiring freeze and Plaintiff's transfer to Gaylord was put on hold.  *Id.*

at 164–65.  Although the transfer was put on hold, the VA Hospital continued to seek an emergency

department physician to replace Plaintiff.  *Id.*  Haddad explained at his deposition that the position

remained posted with the hope that they would find someone interested in Plaintiff's position, and

that Plaintiff would be able to move to Gaylord.  *Id.* at 165–66.  Plaintiff believes Haddad's

explanation was false, and that the VA Hospital was seeking to replace him in retaliation for

requesting accommodations.  *Id.*

The EEOC investigator issued her report on September 21, 2009.  [Dkt. # 18-7].  On October

20, 2009, Plaintiff requested a final agency decision.  On February 17, 2010, the EEOC issued a

final decision finding no discrimination.  [Dkt. # 18-8].  On May 19, 2010, Plaintiff filed this case.

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party has the initial burden of informing the Court of the basis for its motion, and identifying where to look in the record for relevant facts "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).  If the opposing party does not raise a genuine issue of fact and the record indicates the moving party is entitled to judgment as a matter of law, the court shall grant summary judgment. *Id.* at 250.

The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.  The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).  A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.

### III.

The parties have raised five issues in their briefs. The first question is the extent to which events that occurred after Plaintiff filed his EEOC complaint and the investigator concluded her investigation should be considered. The other four questions are whether Defendant is entitled to summary judgment on Plaintiff's retaliation claim, whether Defendant is entitled to summary judgment on Plaintiff's discrimination claim, whether Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim, and whether Defendant is entitled to summary judgment on Plaintiff's claim that he was denied reasonable accommodations.

### A.

Defendant contends that events that occurred after the EEOC investigator issued her report should not be considered because Plaintiff did not exhaust his administrative remedies with respect to those events. Specifically, Defendant contends that the Court should not consider his claim that his contract was not renewed in March 2010[2] or other events that occurred at the same time, because by that time the EEOC had already issued a final decision on Plaintiff's EEOC complaint. *See Strouss v. Mich. Dep't of Corr.*, 250 F.3d 336, 342 (6th Cir. 2001) ("It is well settled that federal courts do no have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the claim can be reasonably expected to grow out of the EEOC charge."); *Davis v. Sodexho*, 157 F.3d 460, 463 (6th Cir. 1998) (noting that a claim is not administratively exhausted where it is not identified in the EEOC complaint, the EEOC investigation

---

[2] It is unclear from the record what transpired in March 2010 that Plaintiff considers discriminatory. Whatever the issue was, it was not identified in the May 2010 complaint (because it had not yet occurred). Moreover, the alleged failure to renew the contract is not clearly described in either party's papers.

-11-

did not reveal the facts underlying the claim, and the facts underlying the claim did not lead the EEOC to expand its investigation).  Indeed, the alleged refusal to renew Plaintiff's contract is the subject of a separate EEOC complaint that is currently pending with the agency.

Plaintiff admits that the contract renewal issue was not raised in his formal EEOC complaint, but nevertheless contends that it should be considered in this case because it was part of a campaign of harassment, discrimination, and retaliation waged by Defendant.  Plaintiff emphasizes that in considering a hostile work environment claim, the Court may look back and consider events that occurred outside the applicable time period in determining whether the alleged harassment was pervasive.  *See McFarland v. Henderson*, 307 F.3d 402, 408 (6th Cir. 2002).  Plaintiff does not, however, identify any authority suggesting that a Court should look forward and consider events that occurred after the EEOC completed its investigation.  Indeed, in this case, the events Plaintiff would like the Court to consider occurred after the EEOC issued its final decision and are the subject of a separate EEOC complaint that remains pending.

Both parties have read the applicable Sixth Circuit cases rather broadly in their own favor, but it is appropriate to exclude the contract issue when considering Plaintiff's retaliation and discrimination claims.  That is, the Court will not consider whether the alleged refusal to renew Plaintiff's contract was discriminatory or retaliatory at this juncture.  Although the claim arguably could be "reasonably expected to grow out of the EEOC charge," *see Strouss*, 250 F.3d at 342, because Plaintiff has already filed an additional charge and it remains pending before the EEOC, it is appropriate to permit the EEOC to consider it in the first instance.

Therefore, while the events that occurred in March 2010 may be relevant for the purposes of the hostile work environment claim, they will not be considered as a separate adverse employment action for the purposes of the retaliation and discrimination claims.

**B.**

Plaintiff contends he was discriminated against and retaliated against for requesting reasonable accommodations and raising his concerns about disability discrimination in four ways. He contends that discrimination and retaliation are demonstrated by Haddad's refusal to let Plaintiff leave early in February 2009,[3] Haddad's refusal to transfer Plaintiff to primary care, the VA Hospital's apparent indifference to Plaintiff's concerns about patient care, and the peer reviews and focused reviews conducted in response to complaints about the care Plaintiff was providing. Defendant contends that Plaintiff's discrimination and retaliation claims should be dismissed because he cannot demonstrate a prima facie case of discrimination or retaliation, and even if he could, Defendant had legitimate, nondiscriminatory reasons for taking the actions that it did. Both parties agree that Plaintiff's claims should be considered under the *McDonnell Douglas Corp. v. Green* burden-shifting framework. 411 U.S. 792, 802–03 (1973).

To establish a prima facie case of retaliation under the Rehabilitation Act, Plaintiff must demonstrate that (1) he engaged in a protected activity; (2) the exercise of the protected activity was known to his employer; (3) he suffered an adverse employment action or was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there is a causal connection between the

---

[3] Plaintiff also raised concerns about a similar incident the following June. Pl.'s Dep. at 150–51. During that incident, however, it was not Plaintiff who requested additional help in the Emergency Department so it is unclear how Haddad's alleged failure to respond was retaliatory toward Plaintiff. *Id.* Moreover, Haddad did respond by routing patients to the intensive care unit. *Id.*

protected activity and the adverse employment action or severe harassment. *See Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 995–96 (6th Cir. 2009); *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 793–94 (6th Cir. 2000).

To demonstrate a prima facie case of discrimination, Plaintiff must establish that (1) he is disabled; (2) that he is otherwise qualified to perform the job's requirements, with or without accommodation; and (3) he was discriminated against solely because of the disability. *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002) (citation omitted).

If Plaintiff can establish a prima facie case of discrimination or retaliation, the burden then shifts to Defendant to articulate a legitimate, nondiscriminatory reasons for the challenged action. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). If Defendant provides a legitimate, nondiscriminatory explanation, the burden returns to Plaintiff who must show that Defendant's explanation is pretext for unlawful discrimination or retaliation. *Id.* "Although the burdens of production shift, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminate against the plaintiff remains at all times with the plaintiff.' " *Macy v. Hopkins Cnty. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007) (quoting, *Burdine*, 450 U.S. at 253).

As an initial matter, Plaintiff may pursue his retaliation and discrimination claims based on discrete wrongs or collectively as a hostile work environment claim. *See Hunter*, 565 F.3d at 993–94. Based on Plaintiff's complaint and his response to Defendant's motion for summary judgment, it appears that he intends to do both. In this section, each alleged discriminatory or retaliatory act will be considered as a discrete wrong. In Part D. below, Plaintiff's hostile work environment theory will be addressed.

-14-

When complaining of a discrete act of discrimination or retaliation, the aggrieved employee must initiate contact with an EEOC counselor within forty-five days of the date of the matter alleged to be retaliatory or discriminatory. 29 C.F.R. § 1614.105(a)(1); *see also Hunter*, 565 F.3d 993 (quoting *Benford v. Frank*, 943 F.2d 609, 612 (6th Cir. 1991)). Plaintiff did not initiate contact with an EEOC counselor within forty-five days of Haddad's alleged refusal to provide him assistance in the emergency department and permit him to leave early when he was ill. The incident occurred in February 2009 and Plaintiff did not contact an EEOC counselor until June 2009. Similarly, Plaintiff raised concerns about the VA Hospital's standard of care in the fall of 2008. As a result, any allegedly discriminatory or retaliatory act that was associated with Plaintiff's concerns was not brought before an EEOC counselor in a timely fashion. Accordingly, the only discrete acts that were timely presented to the EEOC were the alleged refusal to transfer Plaintiff to a primary care position and the peer review and focused review of Plaintiff's work.

With respect to Plaintiff's request for a transfer to a primary care position in June 2009, there is no evidence in the record that Defendant's alleged refusal to permit a transfer was motivated by Plaintiff's disability or Plaintiff's engagement in protected activities. Initially, Plaintiff was denied the transfer because the position he was interested in had already been offered to another person. When that person declined, Plaintiff was immediately offered a "float" position that would have taken him out of the emergency department. He was also offered a primary care position in the Gaylord office within a week of his initial request for a transfer on June 5, 2009. Plaintiff accepted the position in Gaylord and Defendant immediately began looking for a replacement in Saginaw.

Although Plaintiff's transfer to Gaylord was ultimately delayed, Defendant has offered a legitimate, nondiscriminatory reason for the delay and Plaintiff has not demonstrated that

-15-

Defendant's proffered reason was a pretext for discrimination. The delay was the result of a hiring freeze in Saginaw, and the resulting need to retain physicians at the Saginaw VA Hospital. Plaintiff emphasizes that comments made by the human resources manager, Shelly Pullen, and Haddad about his qualifications suggest that the proffered reason was pretextual. Specifically, he contends that Pullen told him he was not eligible to transfer to a permanent position and that Haddad said he was not qualified for a primary care position. Plaintiff's contentions, even if true, do not demonstrate pretext.

While Pullen's statement that Plaintiff was not eligible to a transfer from a temporary to a permanent position was not correct, there is no indication from the record that he was *entitled* to a transfer. *See* 5 C.F.R. § 315.707. The decision with regard to a transfer was a discretionary decision. The fact that Pullen may have misunderstood the applicable regulation does not demonstrate that the stated reason for delaying the transfer—the hiring freeze—was pretextual. Similarly, Haddad's statement with regard to Plaintiff's qualifications does not demonstrate that Haddad was trying to hide discriminatory intentions. Although it certainly seems from the record that Plaintiff was qualified as a primary care physician, Haddad's opinion to the contrary does not show that the stated reason for delaying the transfer was not the real reason.

Importantly, Plaintiff contends that Haddad and Pullen made the statements about his qualifications at the June 5, 2009 meeting where he was denied a primary care position because it had already been offered to another person. Three days later he was offered a similar position that involved working in the primary care department in Saginaw, and within a week he was offered the primary care position in Gaylord, which he accepted. It was not until more than two-months later

-16-

that the hiring freeze was put in place and the transfer was delayed.  It is difficult to understand how statements made in June demonstrate that a decision made in August was pretextual.[4]

Finally, Plaintiff contends that Cheryl Owen, another manager from the human resources department, made a statement that demonstrates that the decision to withhold the transfer to Gaylord was made in retaliation for filing the EEOC complaint.  He contends that Owen told him he would be transferred if he withdrew the EEOC complaint.  Even if Owen made such a comment, it is insufficient to state a prima facie case for retaliation.  Filing an EEOC complaint is certainly a protected activity, but, as Plaintiff admits, Owen had no authority to ensure that the transfer occurred.  Pl.'s Dep. at 167–68; *see Johnson v. Kroger Co.*, 319 F.3d 858, 868 (6th Cir. 2003) ("Although remarks made by an individual who has no authority over the challenged employment action are not indicative of discriminatory intent, the statement of managerial-level employees who have the ability to influence a personnel decision are relevant.") (citation omitted).  Moreover, Plaintiff could not recall the specific details of his conversation with Owen, nor could he remember if he mentioned the conversation to the EEOC investigator.  The comment is Plaintiff's strongest evidence of retaliation, but when viewed in context, Owen's offhand statement still does not establish a sufficient causal connection between the decision to withhold the transfer to Gaylord and Plaintiff's EEOC complaint to create a genuine issue of material fact with respect to the retaliation claim.

---

[4] Moreover, although it is not appropriate to weigh Plaintiff's credibility at this stage of the case, his contention that Pullen told him he was ineligible for a transfer and Haddad told him he was unqualified for a transfer does not demonstrate a "genuine" issue of material fact where Plaintiff was offered two transfers within a week of the statements.  Fed. R. Civ. P. 56(a)

There is also no factual support for Plaintiff's contention that there is a causal connection between his disability and engagement in protected activity and the peer review and focused review. First, Haddad was not involved in initiating the peer review process. Rather, it was initiated as a result of complaints brought by a patient and other health care professionals. Indeed, Haddad did not participate in the peer review process. Second, Haddad did not choose to engage in a focused review. Rather, hospital policy required that anytime a peer review resulted in a Level III finding, a focused review by the physician's supervisor was required. [Dkt. # 18-2-11].

Moreover, the peer review and focused review processes are not adverse employment actions. Hospital policy provides that information from peer review "cannot be used for disciplinary or privileging decisions, reassignment, or demotion." *Id.* Peer review is designed to improve patient care, not adversely affect the careers of the physicians and other professionals who provide that care. *Id.*; *see also Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004) (requiring peer review of medical professor's grant application is not adverse employment action); *Knatt v. Hosp. Serv. Dist. No. 1 of E. Baton Rouge Parish*, 327 F. App'x 472, 484 (5th Cir. 2009) (concluding peer review cannot be an adverse employment action).

Accordingly, Plaintiff's claims based on discreet acts of alleged discrimination and retaliation will be dismissed.

## C.

In order to establish a prima facie case of disability discrimination based on an employer's refusal to provide reasonable accommodations, Plaintiff must demonstrate:

> (1) he is an individual with a [disability] . . . ; (2) he is qualified for the position . . . ; (3) the agency was aware of his disability; (4) an accommodation was needed, i.e., a causal relationship existed between the disability and the request for accommodation; and (5) the agency failed to provide the necessary accommodation.

*DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004) (quoting *Gaines v. Runyon*, 107 F.3d 1171, 1175–76 (6th Cir. 1997)) (alterations in original).  If Plaintiff demonstrates a prima facie case, the burden shifts to Defendant "to demonstrate that the employee cannot reasonably be accommodated, because the accommodation would impose an undue hardship on the operation of its programs." *Id.*

Plaintiff suggests that he was denied three requests for accommodations: (1) an office in the emergency department quiet enough to dictate; (2) stools in the exam rooms; and (3) permission to leave early in February 2009 when he was ill.  Beginning with the third accommodation request, there is no evidence that it was an accommodation request at all.  Rather, it was simply a request to leave early because Plaintiff was feeling ill.  If the request was connected to Plaintiff's disability in any way, there is no evidence that the employer knew it.  It was not discriminatory to prevent Plaintiff from leaving early in February 2009.

Moving to Plaintiff's request for stools and office space within the emergency department, the record demonstrates that Defendant made reasonable and consistent efforts to accommodate his requests as they were made.  Each time Plaintiff verbally requested office space, Haddad acted reasonably quickly to provide office space.  Indeed, Plaintiff was moved into at least four different offices in his first year of employment as he requested locations that were closer to the central area of the emergency department and provided quieter working conditions.  He moved into his final office—room 131—in June 2009, three months after his first written request for accommodating office space.  The law requires reasonable accommodation not immediate or perfect accommodation. *See Gerton v. Verizon S. Inc.*, 145 F. App'x 159, 168 (6th Cir. 2005) (noting lack of authority for proposition that "an employer must 'immediately' act on an accommodation request").

-19-

Similarly, Plaintiff's first request for stools came in February 2009, and his first written request for stools was in March 2009. By June 2009, there were stools in every exam room that he used. Defendant's response was reasonable and Plaintiff was provided with the accommodations he sought. Although there was a delay in meeting Plaintiff's requests, Defendant has provided a reasonable explanation for the delays. "[A]n employee cannot base a disability discrimination claim upon an employer's delay in providing a requested accommodation where the delay is due to internal processing or to events outside the employer's control." *Id.* (citations omitted). Delays caused by administrative procedures for processing a request do not demonstrate discrimination.

Moreover, even if Plaintiff could demonstrate a prima facie case of discrimination based on the alleged failure to provide reasonable accommodations, he did not timely raise the request for an office and stools in an EEOC complaint, and as a result, he is barred from raising it here. *See* 29 C.F.R. § 1614.105. Plaintiff had forty-five days to raise his concerns to an EEOC counselor. He made the initial requests in the fall of 2009 and winter of 2009. The written request was made in March 2009. The requests were fully accommodated by June 2009. His first contact with an EEOC counselor was in July 2009, after the requests were accommodated. Accordingly, Plaintiffs claim based on the alleged denial of reasonable accommodations will be dismissed.

## D.

In the final allegation in his complaint, Plaintiff contends that he was subjected to a hostile work environment. Plaintiff contends that he was harassed because he is disabled and in retaliation for engaging in protected activity related to his disability.

In order to prevail on a hostile work environment claim, Plaintiff must demonstrate that the harassment is "sufficiently severe or pervasive to alter the conditions of the victim's employment

and create an abusive working environment . . . ." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21
(1993). Although the test is not "mathematically precise," whether harassment is sufficiently severe
and pervasive to sustain a hostile work environment claim depends on "the frequency of the
discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere
offensive utterance; and whether it unreasonably interferes with an employee's work performance."
*Id.* at 23. Discriminatory conduct "must be extreme to amount to a change in the terms and
conditions of employment . . . ." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Here, Plaintiff has alleged a series of offhand comments and discriminatory utterances, not
the type of severe and pervasive discrimination that can give rise to a hostile work environment
claim. Indeed, Plaintiff does not even respond to Defendant's contention that the alleged
discrimination was not severe or pervasive. Accordingly, the hostile work environment claim will
be dismissed.

**IV.**

Accordingly, it is **ORDERED** that Defendants' motion for summary judgment [Dkt. # 18]
is **GRANTED**.

It is further **ORDERED** that Plaintiff's complaint is **DISMISSED WITH PREJUDICE**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: August 15, 2011

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 15, 2011.

s/Tracy A. Jacobs
TRACY A. JACOBS